UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**AMERICAN COLOR GRAPHICS, INC.,**

    **Plaintiff,**

v.                                                                                            Case No. 8:05-cv-1512-T-TBM

**ECKERD CORPORATION; BROOKS PHARMACY, INC.; MAXI DRUG, INC.; JEAN COUTU (PJC) USA, INC.,**

    **Defendants.**
_____/

**O R D E R**

THIS MATTER is before the court on **Defendants' Motion for Summary Judgment** (Doc. 187) and Plaintiff's response in opposition (Doc. 201) and **Plaintiff's Motion for Summary Judgment** (Doc. 170) and Defendants' response (Doc. 203). By their cross-motions, the parties each seek summary judgment on all claims raised by Plaintiff in its First Amended Complaint (Doc. 86). The parties filed numerous depositions, affidavits, and other exhibits in support of their respective positions.[1]

---

[1] *See* (Docs. 170-2 through 170-15; 172-86; 187-2 through 187-20; 188-91; 193; 196-2 through 196-11; 200; 202; 204; 207).

I.

A.

The undisputed facts establish that Plaintiff American Color Graphics ("ACG") is a New York corporation with its principal place of business in Tennessee. ACG provides printing and premedia services (preliminary steps in the process of producing the materials to be printed) in the United States and Canada with a focus on printing retail advertising inserts for newspapers and retailers.

Prior to July 31, 2004, Defendant Eckerd Corporation ("Eckerd") was a Delaware corporation with its principal place of business in Largo, Florida, and a subsidiary of J.C. Penney Company, Inc. ("J.C. Penney"). It was one of the largest drugstore chains in the United States, operating, among other things, approximately 2,800 "Eckerd"-branded pharmacies in more than twenty states. Effective February 1, 2004, ACG entered into a written Print Agreement (the "Agreement" or "2004 Agreement") with Eckerd, whereby ACG agreed, among other things, to print Eckerd's weekly newspaper advertising inserts.[2] ACG opened a facility in Largo, Florida, at Eckerd's corporate office for the production of Eckerd's premedia needs and deployed its EventMGR® system for the production of such printing and premedia needs.

On July 31, 2004, Defendant Jean Coutu Group (PJC) USA, Inc. ("Jean Coutu") acquired the stock of Eckerd from J.C. Penney and, at pertinent times since, has operated as a

---

[2]ACG and Eckerd entered into two earlier print agreements, in 1997 and 2000. The 2004 Agreement that is the subject of this action appears repeatedly in the record. For simplicity's sake, the court will refer to the Agreement appended to Defendants' motion for summary judgment. (Doc. 170-2).

subsidiary of Jean Coutu. The acquisition included approximately 1,549 "Eckerd"-branded pharmacies, six regional distribution centers, the Eckerd headquarters in Florida, the Eckerd trade name, and other related assets. Defendants Brooks Pharmacy, Inc. ("Brooks"), and Maxi Drug, Inc. ("Maxi Drug") also are subsidiaries of Jean Coutu. Brooks was an employee leasing company that leased employees to Maxi Drug and later became the payroll processing company for all employees of Brooks pharmacies and Eckerd pharmacies. Maxi Drug operated retail pharmacies in Connecticut, New York, and Massachusetts under the "Brooks Pharmacy" trade name. Following the July 2004 acquisition of Eckerd by Jean Coutu, Eckerd's Largo, Florida, operations were moved to headquarters in Warwick, Rhode Island.

As pertinent to this litigation, the 2004 Agreement provided for a five-year term commencing with preprint events having a sale date of February 1, 2004, and ending with preprint events having a sale date of January 31, 2009, unless earlier terminated pursuant to this Agreement. (Doc. 170-2 at 5, ¶ 2). By the Agreement, Eckerd promised to purchase from ACG a minimum of $9,000,000.00 ("Annual Minimum Purchase") of printing and prepress services annually for a total of $45,000,000.00 ("Agreement Minimum Purchase.") during the term of the Agreement. *Id.* at ¶ 3.1. The Agreement set forth the manner in which the Annual Minimum Purchase and the Agreement Minimum Purchase would be reconciled in the event of a shortfall or expiration of the Agreement. *Id.* at ¶ 3.2.

The parties included a termination clause at Paragraph 26.3 of the Agreement ("Termination Clause"). The Termination Clause states in its entirety:

> A change in control and or a sale of a substantial portion of either party's assets may result in the termination of this Agreement by either party. Written notice of cancellation must be given at least twelve (12) months prior to the effective date of the cancellation

3

>>unless notice is given during the last quarter of the calendar year, in which case the effective date of cancellation shall be December 31 of the following year.

*Id.* at 14, ¶ 26.3. While this provision permitted either ACG or Eckerd to terminate the Agreement upon change of control, it specified no limitation period within which the parties could exercise the right to terminate.[3] *Id.*

>The Agreement also contains an amendment and waiver provision:

>>Except as specifically provided for herein, this Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

*Id.* at 17, ¶ 41).

On letter of April 29, 2005, ACG was notified by Douglas Palmacci, Vice President of Advertising for Brooks, that Eckerd was exercising its right to terminate the Agreement pursuant to the Termination Clause. *See* Letter from Douglas Palmacci to Mike Ross (Doc.

---

[3] The parties' motions note that the 1997 Agreement between ACG and Eckerd included a termination clause permitting the termination of the agreement within 180 days of a change of control. (Doc. 170-3). The right could be exercised only by the party not experiencing the change of control. *Id.* The 2000 Agreement contained no similar termination provision upon a change of control. *See* (Doc. 170-4). The parties appear to agree that the termination provision was re-inserted into the 2004 Agreement because of J.C. Penney's announced intention to sell Eckerd, as well as ACG's financial difficulties at the time of negotiations.

4

190-3).[4]  Eckerd's termination notice states, in relevant part:

> As you are aware, The Jean Coutu Group (PJC) has recently purchased the Eckerd Drug Stores from J.C. Penney. This letter shall serve as twelve (12) month notice that Eckerd is terminating the Agreement effective upon May 1, 2006. This notice is in accordance with paragraph 26.3 of the Print Agreement.

*Id.* ACG and Eckerd continued to perform under the contract through May 2006.

B.

On August 15, 2005, prior to the date of termination, ACG filed a seven-count Complaint (Doc. 1) against Brooks for fraud, breach of contract, breach of the implied duty of good faith and fair dealing, promissory estoppel, equitable estoppel, gross negligent misrepresentation, and specific performance, all stemming from the termination of the Agreement. The court granted in part Brooks's Motion to Dismiss American's Complaint, dismissing five of the seven causes of action. *See* (Doc. 21).

In April 2007, American filed its First Amended Complaint (hereinafter "Complaint") (Doc. 86) alleging claims for breach of contract (Count One) and breach of the implied duty of good faith and fair dealing (Count Two) against Eckerd and tortious

---

[4] Mr. Palmacci's affidavit indicates he was employed by Brooks and the termination letter was sent on Brooks letterhead. He indicates that in July 2004, he became Vice-President of Advertising and Merchandising of Jean Coutu, the corporate parent of the Defendants and Eckerd. Palmacci avers that he made an economic decision to terminate the Agreement with Eckerd and to consolidate the premedia services with Quebecor, the entity already providing such services for Brooks and other Jean Coutu entities. He acknowledges that in November 2004, he executed a letter from Quebecor seeking their proposal for the work, which was provided in April 2005. After reviewing the proposal, he decided to terminate the contract with ACG. Aff. of Douglas Palmacci (Doc. 190 at ¶¶ 16-22). The parties dispute the economic benefits of Defendants using Quebecor over ACG, but the chronology of his account appears undisputed.

5

interference (Count Three) against Brooks, Maxi Drug, Jean Coutu, and Quebecor World, Inc. ("Quebecor"), seeking unspecified compensatory and punitive damages. Brooks, Eckerd, Maxi Drug, and Jean Coutu filed their Answer and affirmative defenses. (Doc. 92). Quebecor moved to dismiss the Complaint for lack of personal jurisdiction. (Doc. 100). In October 2007, the Court granted Quebecor's motion. (Doc. 122). The parties filed cross-motions for summary judgment.

In brief, Plaintiff asserts that at all times, Defendants represented that they would honor the Eckerd contract for the full term of the Agreement and induced it to relocate its operations on behalf of Eckerd to Rhode Island and there train Brooks employees in the use of the EventMGR® system. At the same time, they were preparing to turn over the business to Quebecor. It maintains that Eckerd breached the agreement by unreasonably terminating it. More particularly, it contends that as a matter of law, Defendants waited too long under the circumstances to exercise the termination clause, which, by the parties' intent, was required to be exercised within a reasonable time after a change in control. Further, it argues that Eckerd waived it right to terminate the Agreement by continuing to receive benefits of ACG's performance. By its second count, Plaintiff also urges that by this conduct, Eckerd breached the implied covenant of good faith and fair dealing as a matter of law.

By their motion, Defendants argue simply that Eckerd properly terminated the Agreement after the change in control according to the plain terms of the Agreement. It further urges that Plaintiff exaggerates it claim by maintaining that it is entitled to a lump sum payment equal to the difference between the Agreement Minimum Purchase ($45 million) and the amount Eckerd spent under the Agreement ($27 million) regardless of whether there was a

6

breach. Defendants also argue that there is no claim for breach of an implied duty of good faith because they did not breach any express term of the Agreement and the duty cannot be used to rewrite the contract. On Plaintiff's claim for tortious interference, they urge it also fails because the claim exists, if at all, only against those who are not parties to the Agreement and those alleged to have participated in the decision to terminate were officers or agents of Eckerd.

## II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. School Bd. of Pinellas County*, 902 F. Supp. 1503 (M.D. Fla. 1995). It

...
...

must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

A.

The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages. *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. Dist. Ct. App. 2003).[5] In this instance, the parties do not dispute the existence of a valid contract only whether it was breached. In essence, Plaintiff contends that it is entitled to judgment as a matter of law on the breach of contract claim because Eckerd failed to terminate the contract within a *reasonable* time following the Eckerd sale and improperly terminated the

---

[5] In accordance with the choice of law provision of the Agreement, *see* (Doc. 170-2 at ¶ 22), Florida law governs this contract action.

8

contract only after it obtained benefits under the contract. To support this argument, Plaintiff argues that the contract language is ambiguous and it proffers extrinsic evidence related to the intent of the parties in this regards. In contrast, Eckerd argues that there was no breach because it terminated the contract in full accordance with the plain language of the contract.[6] By its argument, there is no ambiguity in the language used in the Termination Clause, and the court should not rewrite the contract to limit the time for termination and/or consider parole evidence to infer the intent of the parties. The resolution of this dispute, of course, depends on the terms of the contract.

Where contractual terms are clear and unambiguous, the court is bound by the plain meaning of the terms. The intent of the parties by their use of such terms must be discerned from within the "four corners of the document." *Emerald Pointe Property Owners' Ass'n, Inc. v. Commercial Constr. Indus., Inc.,* 978 So. 2d 873, 877 (quoting *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. Dist. Ct. App. 2003)). This is so because the language actually employed by the parties is the best evidence of their intent. *Merin Hunter Codman, Inc. v. Wackenhut Corrections Corp.*, 941 So. 2d 396, 398 (Fla. Dist. Ct. App. 2006); *PS Marinas 3 v. Marina Funding Group, Inc.*, 889 So. 2d 167, 169 (Fla. Dist. Ct. App. 2004). "Words in a contract are presumed to have been used with their ordinary and customary meaning." *Pottsburg Utils., Inc. v. Daugharty,* 309 So. 2d 199, 201 (Fla. Dist. Ct. App. 1975), *quoted in Kel Homes, LLC v. Burris*, 933 So. 2d 699, 702 (Fla. Dist. Ct. App. 2006); *Emerald Pointe*,

---

[6]Defendants posit that the plain language of the clause imposes only two requirements for termination: (1) a change in control and/or sale of a substantial portion of either party's assets; and (2) written notice twelve months prior to the effective date of termination. (Doc. 170-2 at 14, ¶ 26.3). According to Defendants, since these two conditions were met and the contract set no time limitation on the right to terminate following a change in control, it properly terminated the contract.

9

978 So. 2d 873, 877-78 (Fla. Dist. Ct. App. 2008); *Wellington Realty Co. Ltd. Partnership v. ColorAll Technologies Int'l, Inc.*, 951 So. 2d 921, 922 (Fla. Dist. Ct. App. 2007).

Thus, the court must initially determine as a matter of law whether an ambiguity exists in the Agreement. *Wheeler v. Wheeler, Erwin & Fountain, P.A.*, 964 So. 2d 745, 749-50 (Fla. Dist. Ct. App. 2007). If there is no ambiguity, the interpretation of the contract is a question of law to be decided by the court and determinable on summary judgment. *Id.*; *Bradley v. Sanchez*, 943 So. 2d 218, 221-22 (Fla. Dist. Ct. App. 2006); *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.,* 771 So. 2d 628, 631 (Fla. Dist. Ct. App. 2000). However, if the contract language is ambiguous, extrinsic evidence may be considered by the court to ascertain the intent of the parties. *Emerald Pointe*, 978 So. 2d at 877 (citing *Okeechobee Landfill, Inc. v. Republic Servs. of Fla., Ltd. P'ship,* 931 So. 2d 942, 945 (Fla. Dist. Ct. App. 2006)); *Castillo v. State Farm Fla. Ins. Co.*, 971 So. 2d 820, 823 (Fla. Dist. Ct. App. 2007) (quoting *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001)). A contractual term is ambiguous if it is fairly susceptible to more than one reasonable interpretation. *Okeechobee Landfill*, 931 So. 2d at 945; *Abraham K. Kohl, D.C. v. Blue Cross & Blue Shield of Fla., Inc.*, 955 So. 2d 1140, 1143 (Fla. Dist. Ct. App. 2007) (quoting *McInerney v. Klovstad,* 935 So. 2d 529, 531-32 (Fla. Dist. Ct. App. 2006)). Interpretation of ambiguous contract terms involves questions of fact that preclude summary disposition. *Id.*; *Langford v. Paravant, Inc.*, 912 So. 2d 359, 361 (Fla. Dist. Ct. App. 2005).

Ambiguities can either be patent or latent. *Saenz v. Campos*, 967 So. 2d. 1114, 1117 (Fla. Dist. Ct. App. 2007). A patent ambiguity is one that appears on its face; a latent ambiguity arises "where the contract language is clear and intelligible and suggests a single

meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *Id.* (quoting *Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC*, 915 So. 2d 657 659 (Fla. Dist. Ct. App. 2005); *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 2d 544, 547 (Fla. Dist. Ct. App. 1974). A latent ambiguity may also arise when contract provisions fail to specify the rights or duties of the parties in certain situations. *Wheeler*, 964 So. 2d at 749-50. "[A] true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Lambert v. Berkley S. Condo. Ass'n, Inc.,* 680 So. 2d 588, 590 (Fla. Dist. Ct. App. 1996) (citation omitted).

On this issue, the court does not write on a clean slate. In the context of Brooks's motion to dismiss (Doc. 12), the parties previously raised similar arguments regarding Plaintiff's breach of contract claim and Eckerd's termination of the contract. This court granted in part the motion but denied the motion as to the breach of contract claim noting:

> Accepting American's allegations as true, there is at the very least a question of fact as to the parties' intent in drafting the Termination Clause and consequently whether a breach occurred. Although Brooks contends that there was no breach because the Termination Clause is express and unambiguous, the Eleventh Circuit has recognized that an ambiguity exists "where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between possible meanings." *Johnson Enterps. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1310 (11th Cir. 1998).

(Doc. 21 at 6-7). The court found that on the face of the Complaint, ACG had pleaded facts sufficient to survive the motion to dismiss. *See id.* at 7.

11

Here, the Termination Clause clearly fails to specify a time frame within which a party may exercise the option to terminate the contract after a change in control. Thus, it is unclear when the clause could be invoked, particularly under circumstances where there is a passage of time, during which assurances from one party are purportedly made to another prompting the dedication of additional resources for performance by one of the parties. Upon the court's consideration, the Termination Clause "does not specify the rights or duties of the parties in certain situations," and the Agreement contains a latent ambiguity within the clause. Therefore, extrinsic evidence is appropriately (and necessarily) considered in interpreting the parties' respective intent in this regard.

As the parties' proffered evidence and argument demonstrates, there is vast disagreement as to their intent in agreeing to the Termination Clause. Further, assuming no meeting of the minds on the matter, under Florida law, the general rule is that when a contract does not expressly fix the time for performance of its terms, the law will imply a reasonable time. *Denson v. Stack*, 997 F.2d 1356, 1361 (11th Cir. 1993) (citing *Greenwood v. Rotfort,* 158 Fla. 197, 28 So. 2d 825, 831 (1946); *Fleming v. Burbach Radio, Inc.,* 377 So. 2d 723, 724 (Fla. Dist. Ct. App. 1979)); *Hammond v. DSY Developers, LLC*, 951 So. 2d 985 (Fla. Dist. Ct. App. 2007). Under either analysis, the parties wholly disagree on the reasonableness of the Defendants' actions after the change in control.[7]

---

[7]In addition to its "plain language" argument, Defendants proffer extrinsic evidence to support it position that the parties agreed that no time limitation should be applied to the exercise of the right to terminate the contract after a change of control. They persuasively point to the history of the parties' agreements as evidence of their mutual intent not to impose a time limitation on the Termination Clause. In any event, in the given circumstances, Defendants argue that Eckerd's termination of the contract nine months after the acquisition was reasonable and in accordance with contract provisions. Plaintiff responds that the extrinsic evidence reveals that the parties intended for the right to terminate to be mutual and

12

In short, because the language of the Termination Clause is ambiguous and there are numerous disputes as to the parties' intention and the parties' actions related to the exercise of that clause, summary disposition of Count One in favor of either party is precluded.[8]

B.

This conclusion dictates that the court deny the parties' motions as to Count Two as well. There, Plaintiff claims a breach of the duty of good faith and fair dealing by Eckerd in relation to its exercise of the Termination Clause. To prove a breach of the implied duty of good faith and fair dealing, Plaintiff "must demonstrate a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party fo the benefits of the agreement." *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000). The same underlying factual disputes addressed above preclude the summary disposition of this claim as well as it relates to Eckerds' exercise of the Termination Clause.

---

invoked at a "reasonable time," i.e., at or near the time of the change in control and not at "any time." According to Plaintiff, it became unreasonable for Eckerd to terminate after they induced Plaintiff to invest additional resources to relocate its facility to Rhode Island, deploy its EventMGR system, and train Brooks' employees for its use.

[8]Plaintiff denies that it is basing its breach of contract claim on a waiver of the Termination Clause apart from the issue of reasonableness. *See* (Doc. 201 at 13). As argued by the Defendants, the Agreement here expressly requires waivers of contract provisions to be made in writing by the party waiving compliance, and it expressly states that delay will not constitute a waiver. *See* (Doc. 170-2 at 17, ¶ 41). Plaintiffs do not argue or proffer any written waiver by Defendants. Therefore, Defendants are entitled to summary judgment this aspect of Plaintiff's breach of contract claim to the extent that it is raised.

C.

With respect to Plaintiff's claim that it is due the balance of the $45 million Agreement Minimum Purchase requirement as damages for Eckerd's breach, Defendants contend that it is entitled to a finding of no liability and summary judgment in its favor.[9] Defendants argue that by the express terms of the Agreement, the reconciliation called for by this provision of the Agreement has application only upon "the expiration of the term of the Agreement" and not upon an earlier termination as occurred here. By Defendants' argument, Eckerd cannot be held liable for the lump sum payment of any balance due on the Agreement Minimum Purchase under this provision.[10] Plaintiff responds that this provision was negotiated for based on its promise to supply Eckerd's needs in expectation that it would receive $45 million in business from Eckerd. By its argument, if Eckerd breached the Agreement, it is entitled to damages "which the parties agreed would be the amount of the purchasing shortfall." (Doc. 210 at 15).

As noted above, the Agreement defines the term of the contract as "five (5) years commencing with preprint events having a sale date of February 1, 2004, and ending with preprint events having a sale date of January 31, 2009, <u>unless earlier terminated pursuant to this Agreement</u>." (Doc. 170-2 at 4, ¶ 2) (emphasis added). Section 3.2 of the Agreement, entitled "Purchase Agreement," states in pertinent part:

---

[9]According to Defendants, they purchased over $27,000,000.00 in printing work from ACG pursuant to the Annual Minimum Purchase. *See* Palmacci Aff. (Doc. 190 at ¶ 23).

[10]Eckerd argues the Plaintiff's interpretation of this provision renders the Termination Clause meaningless, as it would never exercise the clause if in doing so the Plaintiff would automatically be entitled to the full balance owed. Consistent with Florida law, it urges the court to construe the contract so as to give effect to every provision.

14

> . . . Within sixty (60) days from the expiration of this Agreement, the parties will reconcile the Agreement Minimum Purchase. In the event the Agreement Minimum Purchase is not met for any reason other than a default by Supplier . . . , then Eckerd will, in its sole discretion, either compensate Supplier by paying a lump sum equal to the amount of the shortfall or extend the term of this Agreement for the length of time as necessary to make up such shortfall at the then current contract prices for the printing work, as Supplier's sole and exclusive remedy for Eckerd's failure to meet such Agreement Minimum Purchase and/or any Annual Minimum Purchase.

(Doc. 170-2 at 4, ¶¶ 3.1, 3.2).

By the court's reading of these provisions, the only reasonable construction is that proposed by Defendants. The reconciliation provision was applicable only on the expiration of the agreement and not when the contract was otherwise terminated early. There is nothing in this language to support Plaintiff's argument that this reconciliation provision was intended as the measure of damages upon the early termination of the Agreement (whether proper or not). While the court does not hereby foreclose Plaintiff from using any appropriate measure of damages at trial, should it prove up a breach of this contract, the court does conclude that ACG is not automatically entitled to the balance owed under the $45 million Agreement Minimum Purchase merely because of the breach. To this extent, Defendants' motion is granted.

### D.

Defendants also seek summary judgment as to ACG's tortious interference claim against Brooks, Maxi/Brooks, and Jean Coutu. Defendants contend that those alleged to have participated in the decision to terminate the Agreement were officers or agents of Eckerd and there is no evidence that they interfered with the subject Agreement. In particular, Defendants

assert that individuals such as Michael Coutu, David Morocco, William Welsh, and Robert Puliot were acting on behalf of Eckerd after its acquisition and through the termination of the Agreement. Because a tortious interference claim exists only against persons who were not party to the contract, and Plaintiff has no proof that a third party interfered improperly with the Agreement, Defendants urge they are entitled to summary judgment on this claim.

In response, Plaintiff argues that as a matter of law, a subsidiary or parent may be liable for tortious interference when it acts with improper motive or by improper methods. It argues that the facts show the Defendants' interference began prior to the closing of Jean Coutu's purchase of Eckerd, through the deceit of actors such as Morocco, Palmacci, Melissa Labrecque, and Puliot who were employees of Brooks, Maxi Drug, and/or Jean Coutu USA. In support, Plaintiff again cites to the "Plan" (Doc. 170-12), and proffers deposition testimony by these individuals. According to Plaintiff, the evidence reveals that these persons continued to interfere with the Agreement following the acquisition of Eckerd by Jean Coutu, and the documentary evidence shows no involvement by Eckerd in the process of replacing ACG with Quebecor. Plaintiff also points to the November 15, 2004, Letter of Intent between Brooks and Quebecor and the April 29, 2005, notice of termination from Palmacci to Mike Ross, both of which were on Brooks/Maxi Drug letterhead.[11] *See* (Doc. 196-2 at 1-2).

---

[11] The exact relationship between these individuals and the Defendants is somewhat difficult to glean from the motions and the witnesses' testimony. For example, in his affidavit, Palmacci, who claims to be the person who made the termination decision, indicates that his W-2s reflect that he was an employee of Brooks from his hiring through the end of 2005. *See* (Doc. 190 at ¶ 1 n.1). Nonetheless, he testified that the April 29, 2005, termination notice was sent on behalf of Eckerd, although the notice was printed inadvertently on "Brooks Pharmacy" stationery. *Id.* at ¶ 22 n.4.

To maintain a claim for tortious interference, the plaintiff must allege and prove the following elements: (1) the existence of a contractual relationship; (2) defendant's knowledge of the contract; (3) an intentional and unjustified interference with the contractual relationship by the defendant; and (4) damage to the plaintiff as a result of the interference. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *ASA Acugrade, Inc. v. Am. Numismatic Ass'n*, No. 6:05-cv-1285-Orl-19 DAB, 2006 WL 1640698, at *10 (M.D. Fla. June 9, 2006). Because a tortious interference claim "exists only against persons who are not parties to the contractual relationship," the plaintiff must show that a "third party interfere[d] with a contract or business relationship by influencing, inducing or coercing one of the parties to the relationship to abandon the relationship or breach the contract, thereby causing injury to the other party. *West v. Troelstrup*, 367 So. 2d 253, 255 (Fla. Dist. Ct. App. 1979), *quoted in Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. Dist. Ct. App. 1999); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. Dist. Ct. App. 1991). A claim for tortious interference requires a showing of both an intent to damage the business relationship and a lack of justification to take the action that caused the damage. *Networkip, LLC v. Spread Enterps., Inc.*, 922 So. 2d 355, 358 (Fla. Dist. Ct. App. 2006).

It is axiomatic that a corporation can only act through its officers and agents. *Browning v. State,* 101 Fla. 1051, 133 So. 847, 848 (1931). In this instance, the proffered evidence reveals factual disputes concerning whether one or more of the individual officers or agents of the Defendants were acting on behalf of Eckerd or on behalf of Brooks, Maxi/Brooks, and Jean Coutu when they made representations or took actions allegedly interfering with Plaintiff's contractual relations with Eckerd. Ultimately, factual disputes

arise on the issue of whether these Defendants both intentionally and without justification interfered with the contractual relationship between ACG and Eckerd as well. Therefore, Defendants' motion for summary judgment as to Count Three is also denied.

IV.

For the foregoing reasons, it is **ORDERED** that **Plaintiff's Motion for Summary Judgment** (Doc. 170) is **DENIED**, and **Defendants' Motion for Summary Judgment** (Doc. 187) is **GRANTED in part** and **DENIED in part** as set forth herein.

**Done and Ordered** in Tampa, Florida, this 25th day of July 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record